[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 27, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15740
Non-Argument Calendar
_____

BIA No. A96-092-963

HENRY LOCADIO PAXTOR CHAVEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(June 27, 2006)**

Before DUBINA, HULL and FAY, Circuit Judges.

PER CURIAM:

Henry Locadio Paxtor Chavez, through counsel, petitions this Court for review of the Board of Immigration Appeals' ("BIA's") order, summarily affirming the immigration judge's ("IJ's") decision denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), filed pursuant to INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231, and for withholding of removal under the United Nations Convention on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), filed pursuant to 8 U.S.C. §§ 1158, 1241(b)(3), 8 C.F.R. § 208.16(c). Chavez argues on appeal that the IJ's determination he failed to establish statutory eligibility for relief from removal is not supported by substantial evidence. For the reasons discussed more fully below, we dismiss for lack of jurisdiction Chavez's petition to the extent he is (i) challenging the denial of withholding of removal under the INA and the CAT, and (ii) raising a due-process claim under the Fifth Amendment. Furthermore, we deny his petition to the extent he is seeking review of the denial of asylum relief.

In August 1997, Chavez, a native and citizen of Guatemala, entered the United States without authorization. In September 2003, Chavez filed an application for relief from removal, without identifying the specific grounds on which he was seeking relief. Chavez, however, generally explained that (1) his

father had belonged to the Civil Defense Patrols,[1] and (2) "anti government" and "other" groups had threatened him when he had refused to join them. In December 2004, the former Immigration and Naturalization Service ("INS")[2] denied Chavez's application and served him with a notice to appear, charging him with removability for being present in the United States without having been admitted or paroled, pursuant to former INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).

On June 7, 2004, at a hearing on Chavez's application for relief from removal, Chavez, who again was proceeding pro se and was the only witness,[3] offered the following testimony. After entering the United States without inspection in 1997, Chavez had remained in the United States. Chavez's family still lived in Guatemala, where his mother owned land and worked in agriculture. On the other hand, Chavez's wife, who also was Guatemalan and was not a legal resident of the United States, resided with him in the United States with their minor daughter, who was a resident.

---

[1] The State Department's 2003 Country Report for Guatemala ("the 2003 Country Report") identified the Civil Defense Patrols as "paramilitary elements conscripted by the military during the internal conflict."

[2] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.

[3] On March 17, 2004, Chavez appeared pro se before the IJ, at which time the IJ informed him that he had a right to represented by counsel and could present witnesses and evidence on his behalf at his evidentiary hearing.

Chavez further testified that he left Guatemala in 1997 because: (1) his father had been persecuted by "the previous guerillas," (2) these guerillas had threatened to kill his entire family, and (3) his father had told him that he "needed to leave the country." Although agreeing that the Guatemalan government and the guerillas, subsequent to him leaving Guatemala, had reached a peace agreement, Chavez contended that his mother "has to move from one place to another because sometimes [guerillas] are looking for them." Chavez also stated that (1) the guerillas had formed "another group," (2) this group was following his family, and (3) this group had beaten his now deceased father. Chavez, however, conceded that he did not know the identity of this group.

Chavez testified that, in addition to being afraid to return to Guatemala because "they" could kill him, he believed he would not be safe if he relocated to Guatemala City because "they are after us everyplace [in Guatemala]." Chavez explained that his father had died on March 26, 2004, two months prior to the evidentiary hearing, after being "beaten up" by the persons who were persecuting him in Masate, which was another district in Guatemala. Chavez, however, did not know the name of the group that was persecuting his father because his father had not revealed this information to protect Chavez. Chavez also stated that, although a friend had witnessed the beating of Chavez' father, (1) Chavez only knew about

4

the beating through his mother, who had gone to visit his father in Masate; and (2) he had no physical evidence documenting this incident.[4]

Chavez stated that his father had lived apart from his mother for four years prior to being killed and had never left Guatemala. Chavez also agreed that his mother and five younger siblings, who were still in school, had continued living in Quezaltenango, Guatemala. Moreover, Chavez added no more details after the IJ asked him whether he could tell her anything else about his father's death.

In addition to Chavez's testimony, the government submitted for the IJ's review the 2003 Country Report, which included that Guatemala is a democratic republic with separation of powers and a centralized administration. Although there were some improvements in the government's human-rights record, serious abuses persisted. Indeed, these abuses involved "credible reports of . . . politically motivated killings by non[-]state actors," including "at least 29 killings of opposition political candidates." This report, however did not include that either former members of the Civil Defense Patrols or their families had been targeted.

At the conclusion of this evidentiary hearing, the IJ found Chavez removable, denied his application for asylum under the INA and for withholding of

---

[4] Chavez did produce an untranslated death certificate, which the IJ admitted into evidence. This certificate reflected that Chavez's father, at the age of 39, had died of internal injuries ("Trauma cerrado de abdomen/Homoperitoneo").

5

removal under the INA and the CAT, but granted him voluntary departure,[5] with an alternate order of removal to Guatemala. The IJ explained that, although Chavez had filed his application for asylum more than one year after he arrived in the United States, she still had considered his application because he had filed it soon after he had turned 21 years' old.[6] The IJ, however, found that Chavez, whose "case" had been "vague to the extreme," had failed to establish eligibility for asylum or withholding of removal under the INA or the CAT.

In reaching this determination, the IJ noted that Chavez's testimony had included that Chavez's father, who had been involved in the Civil Defense Patrols in Guatemala during the 1990s, had been beaten two months prior to the evidentiary hearing by an unknown group that previously had persecuted him. The IJ also noted that Chavez had indicated that this group had "something to do maybe with the guerilla[s], but now they wear masks, and they went after his father." The IJ discussed that, although Chavez had testified that his mother had moved "from place to place," the IJ found that she had not moved "too much" since she owned

---

[5] The Attorney General may permit an alien to voluntarily depart the United States at the conclusion of the removal proceedings if, among other things, the alien has been present in the United States for at least one year prior to the NTA being served. See INA § 240B(b)(1)(A), 8 U.S.C. § 1229c(b)(1)(A).

[6] An alien may not apply for asylum more than one year after his arrival in the United States unless the IJ determined that there are "extraordinary circumstances relating to the delay in filing an application" within that period. See INA § 208(a)(2)(B), (D), 8 U.S.C. § 1158(a)(2)(B), (D).

land and was a farmer. The IJ discussed that, after being given several opportunities to provide more information about his father's death, Chavez had not done so. Finally, the IJ found that Chavez unreasonably believed that he also would be killed, despite that his mother and siblings were still living in the same region of Guatemala, unharmed. Thus, the IJ concluded that "none of this [evidence] satisfie[d] [Chavez's] burden of proof with regard to the legal requirements for the relief sought."

Through counsel, Chavez appealed the IJ's decision to the BIA, arguing that the IJ improperly had denied his application for asylum due to the IJ's erroneous determination that Chavez had failed to establish either past persecution or a well-founded fear of future persecution. Chavez specifically challenged the IJ's findings that (1) he had no reason to fear returning to Guatemala because his mother and siblings had continued living there, (2) his testimony was "extremely vague," and (3) he had failed to produce corroborating evidence. He also contended that, even assuming that he failed to establish a well-founded fear of persecution, the IJ should have granted him discretionary asylum, pursuant to 8 C.F.R. § 208.13(b)(1)(iii), because there is a reasonable possibility that he may suffer other serious harm upon removal to Guatemala, in light of the fact that his father was beaten to death in March 2004. A single member of the BIA summarily affirmed the IJ's decision, without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4).

7

Chavez, still proceeding with counsel, argues on appeal that the IJ improperly denied his application for asylum and for withholding of removal under the INA and the CAT, based on the IJ's erroneous conclusion that Chavez failed to establish either past persecution or a well-founded fear of future persecution. Chavez specifically contends that his testimony, which he argues the IJ implicitly found credible by incorporating into her decision, included that "guerillas," in an effort to stop Chavez and his family from participating in the Civil Defense Patrols, had beaten his father several times, threatened to kill his entire family, and ultimately killed his father. Chavez also argues that the IJ, in concluding that he had not established a well-founded fear of future persecution, had erred in relying on the fact that his mother and younger siblings had remained, unharmed, in one location in Guatemala because neither his mother nor his siblings had been members of the Civil Defense Patrols or been recruited by the guerillas.

Alternatively, Chavez contends that, after he established past persecution, the government failed to rebut the presumption of a well-founded fear of future persecution. Chavez also generally asserts that, even if he has no well-founded fear of future persecution, he should have been granted discretionary asylum because, pursuant to 8 C.F.R. § 208.13(b)(1)(iii), he established that there is a reasonable possibility that he may suffer other serious harm upon his removal to Guatemala. Furthermore, Chavez challenges the IJ's general finding that his

8

testimony was vague, arguing that his detailed testimony was consistent with his application and was supported by his father's death certificate and the 2003 County Report. Finally, Chavez asserts that, if the IJ was not satisfied with the "depth or breadth of his testimony," she should have questioned him further because, at the hearing, he was not represented by counsel.[7]

As a preliminary matter, Chavez generally asserted in his initial brief on appeal that aliens have due-process rights during removal proceedings, which include the right to a meaningful opportunity to be heard and a thorough review on appeal to the BIA. Prior to filing his reply brief, however, he did not discuss in detail how he was denied due process. To the extent he did not adequately assert a due-process argument in his initial brief, he has abandoned this argument. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228-29 n.2 (11th Cir. 2005) (explaining that petitioner abandoned issue by failing to offer argument on it in her brief); see also United States v. Britt, 437 F.3d 1103, 1104 (11th Cir. 2006) (explaining our "prudential rule" of declining "to consider issues raised for the first time in an appellant's reply brief").

Regardless, Chavez failed to raise any due-process arguments in his appeal to the BIA. Chavez also failed to challenge in his appeal to the BIA the IJ's

---

[7] Chavez also argues in his reply brief, in greater detail, why he believes he was denied due process during his removal hearing.

9

decision to the extent he was denied withholding of removal under the INA and the CAT. Thus, we lack jurisdiction over these issues because Chavez failed to exhaust his administrative remedies. See Taylor v. United States, 396 F.3d 1322, 1327 (11th Cir. 2005) (holding that "a court may review a final order of removal only if 'the alien has exhausted all administrative remedies available to the alien as of right'" (quoting 8 U.S.C. § 1252(d)(1)); Fernandez-Bernal v. Att'y Gen. of U.S., 257 F.3d 1304, 1317 n. 13 (11th Cir. 2001) (interpreting this exhaustion requirement as jurisdictional). We, therefore, dismiss Chavez's petition to the extent he is raising due-process arguments and seeking review of the denial of withholding of removal under the INA and the CAT.[8]

Examining the denial of Chavez's remaining asylum claim, "[w]hen a single member of the BIA summarily affirms the IJ's decision without an opinion, such as here, the IJ's decision becomes the final removal order subject to review." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1254 (11th Cir. 2006). "To the extent that the IJ's decision was based on a legal determination, our review is de novo." Id. "On the

---

[8] We note that, even if we had jurisdiction to review these issues, to prevail on a due-process challenge to a removal proceeding, an alien must demonstrate the alleged misconduct resulted in "substantial prejudice." See Mullen-Cofee v. INS, 976 F.2d 1375, 1380 (11th Cir. 1992) (examining due-process claim that alien's counsel made misrepresentations during the deportation hearing). Additionally, given Chavez's failure to carry his lower burden of proof with regard to asylum, he could not show that he was entitled to withholding of removal under the INA or the CAT. See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1288 n.4 (11th Cir. 2005) (noting that, because the alien had failed to establish a claim of asylum on the merits, "he necessarily fail[ed] to establish eligibility for withholding of removal or protection under [the] CAT").

10

other hand, the IJ's factual determinations are reviewed under the substantial evidence test, and we 'must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Id. at 1254-55 (quoting  Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001)).  Under the substantial evidence test:

> we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision.  Thus, a finding of fact will be reversed 'only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.'

Ruiz, 440 F.3d at 1255 (quoting Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035 (2005)).

An alien who arrives in, or is present in, the United States may apply for asylum.  INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee."  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[9]  A "refugee" is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or

_____

[9]  Pursuant to the REAL ID Act, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003.  See Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

11

unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). "The asylum applicant carries the burden of proving statutory 'refugee' status." Ruiz, 440 F.3d at 1257 (quoting D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004)).

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R § 208.13(b)(1). If he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

12

If credible, an alien's testimony may be sufficient to sustain his burden of proof without corroboration. Ruiz, 440 F.3d at 1255. "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. (quotation omitted). However, when an IJ "says not that [the IJ] believes the asylum seeker or [that] [the IJ] disbelieves her . . . the reviewing Court is left in the dark," and that an IJ must make a "clean determination[] of credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (internal quotations omitted). Because the IJ in the instant case did not clearly state that she was making an adverse credibility determination, we conclude that no such determination is dispositive on appeal.

In examining whether Chavez established past persecution, the statute governing asylum "protect[s] not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control . . . ." Ruiz, 440 F.3d at 1257. However, "[p]ersecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437-38 (11th Cir. 2004) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (emphasis in original)). The applicant must present "specific, detailed facts showing a good reason to fear that he will be singled out for persecution on account of such an opinion." Al Najjar, 257 F.3d at 1287.

13

Evidence that either is consistent with acts of private violence, or merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground. Sanchez, 392 F.3d at 438.

Here, Chavez contended that persons persecuted his father and, two months prior to the evidentiary hearing, killed his father by beating him. Chavez, however, conceded that, although a friend witnessed the beating, his father, in an effort to protect Chavez, had not told him who was persecuting him, and he did not know who killed his father. To the extent Chavez also vaguely asserted that "the former guerillas had threatened to kill his entire family during the 1990s, he failed to show that these threats involved more than isolated incidents. See Sepulveda, 401 F.3d at 1231 (explaining that, although the INA does not expressly define "persecution" for purposes of qualifying as a refugee, "persecution" is an "extreme concept" requiring "more than a few incidents of verbal harassment or intimidation").[10] Additionally, the IJ did not err in considering the fact that Chavez failed to produce corroborating evidence, other than an untranslated death certificate reflecting that Chavez's father died of internal injuries. See Yang, 418 F.3d at 1201 (explaining that "[t]he weaker the applicant's testimony . . . the greater the need for

_____

[10] In Sepulveda, we concluded that the petitioner did not show past persecution where she received three threatening telephone calls, her brother was threatened in person, and a bomb was placed in her work mailbox. See Sepulveda, 401 F.3d at 1231.

corroborative evidence").  Thus, Chavez did not present "specific, detailed facts" that demonstrated past persecution based on a protected factor.

Chavez also failed to demonstrate, in the alternative, a future threat to his life or freedom in Guatemala, based on a protected factor.  As the IJ noted, Chavez's mother and five younger siblings still were living in Guatemala, and Chavez did not testify that they had been harmed.  See Ruiz, 440 F.3d at 1259 (noting that the petitioners' claim that they had a well-founded fear of future persecution in the area of Colombia where the petitioners previously lived was belied by the fact that their son and one of the petitioner's parents had remained in that area, unharmed).  Chavez is arguing that (1) these family members are distinguishable because they were not recruited by the Civil Defense Patrols; and (2) the 2003 Country Report included that Guatemala's human-rights record remained poor and serious abuses involved "credible reports of . . . politically motivated killings by non[-]state actors."  This report, however, did not reflect that former members of the Civil Defense Patrols or their families had been targeted. Chavez, who has not lived in Guatemala since 1997, also failed to explain why he still would be targeted over eight years later.

Furthermore, to the extent IJ relied on her finding that Chavez did not show that he could avoid persecution by relocating within Guatemala, we recently clarified that "it is not unreasonable to require a refugee who has an internal

15

resettlement alternative in his own country to . . . establish that such an option is unavailable." See Arboleda v. U.S. Att'y Gen., 434 F.3d 1220, 1223 (11th Cir. 2006) (quotation omitted). We also discussed in Arboleda that, since 2001, the regulations have codified the country-wide requirement, and have instructed the IJ to consider whether "under all the circumstances it would be reasonable to expect the applicant [to relocate]." Id. (quoting 8 C.F.R. § 1208.13(b)(2)(ii)).[11] After examining the relevant country reports for Colombia, we concluded in Arboleda that the Revolutionary Armed Forces of Colombia ("FARC") operates country-wide in Colombia, and that the government, therefore, had failed to show that relocation was a viable option for the petitioners, whom the BIA presumed had suffered past persecution, to escape future persecution. See id. at 1224-26.

Unlike the facts in Arboleda, Chavez failed to establish past persecution. He, therefore, had the burden of establishing a well-founded fear of future persecution that was both subjectively genuine and objectively reasonable. See Al Najjar, 257 F.3d at 1289. Moreover, as discussed above, Chavez failed to

_____

[11] The regulations identify the following non-exclusive considerations that are relevant to this "reasonableness" determination:

> whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic or judicial infrastructure; geographical limitations; and social and cultural restraints, such as age, gender, health, and social and familial ties.

See 8 C.F.R. § 1208.13(b)(3).

16

demonstrate that he will be singled out for persecution on account of a protected factor.

Thus, even if we were to conclude that the 2003 Country Report established country-wide persecution, a contrary conclusion would not compelled by this evidence. See Sepulveda, 401 F.3d at 1232 n.7 (affirming the IJ's denial of asylum, despite the inclusion in Country Reports for Colombia that guerillas exercised an influence throughout the country, because the petitioner had failed to establish that she would be singled out for persecution on account of a protected ground). Indeed, as we recently explained, "only in a rare case does the record compel the conclusion that an applicant for asylum suffered past persecution or has a well-founded fear of future persecution." See Silva v. U.S. Att'y Gen., No. 04-10351, manuscript op. at 17-18 (11th Cir. May 5, 2006) (concluding that record evidence of a single written death threat, a shooting, and numerous anonymous harassing telephone calls did not "compel" a contrary conclusion).

Finally, to the extent Chavez is arguing summarily that, regardless of whether he established a well-founded fear of future persecution, the IJ abused her discretion in not granting him asylum under § 1208.13(b)(1)(iii), the BIA determined in Matter of Chen, 20 I & N Dec. 16 (BIA 1989), that, even if the presumption of future persecution arising from past persecution has been rebutted, an alien may have suffered such severe or atrocious forms of persecution at the

17

hands of the former regime such that it would be inhumane to require the alien to return to his home country.  Id. at 19.  The BIA further explained:

> [T]here may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution . . ..  It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate.  Even though there may have been a change of regime in the country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

Id.  Applying this analysis, the BIA in Chen granted "humanitarian asylum" to an applicant who had been disabled by torture and the denial of medical care during China's "Cultural Revolution," and who was suffering from depression and suicidal thoughts.  Id. at 19-21.

This category of asylum is now codified at § 1208.13(b)(1)(iii), which provides that an IJ may grant an applicant humanitarian asylum on a discretionary basis if the applicant has demonstrated "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or "a reasonable possibility that he or she may suffer other serious harm upon removal to that country."  8 C.F.R.§ 1208.13(b)(1)(iii)(A), (B).  As discussed above, "[t]he burden of proof is on the applicant for asylum to establish that he is a refugee . . ..  The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."  8 U.S.C. § 1208.13(a).

18

The BIA has interpreted this form of relief to require an applicant first to show "severe harm" and "long-lasting effects."  See In re N-M-A, 22 I & N Dec. 312, 326 (BIA 1998); see also Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1327 n.4 (11th Cir. 2001) (explaining that an agency's interpretation of its own regulations is entitled to "great deference," and that "[t]he degree of deference is especially great in the field of immigration").  Moreover, as persuasive authority, other circuits that have reviewed applications for humanitarian asylum have concluded that this relief is reserved for the most extraordinary cases.  See Gonahasa v. U.S. INS, 181 F.3d 538, 544 (4th Cir. 1999) (holding that "[e]ligibility for asylum based on severity of persecution alone is reserved for the most atrocious abuse"); Bucar v. INS, 109 F.3d 399, 405 (7th Cir. 1997) (characterizing humanitarian asylum as being reserved for situations such as the German Jews, the victims of the Chinese "Cultural Revolution," and survivors of the Cambodian genocide); Krastev v. INS, 292 F.3d 1268, 1280 (10th Cir. 2002) (explaining that past persecution must have been so severe that it would "so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of future persecution") (internal quotation omitted).

At the time of the hearing, Chavez's mother and his five younger siblings still were living in Guatemala.  Although Chavez testified that "the previous

guerillas" had threatened to kill his family during the 1990s, he did not claim that this treatment resulted in "severe harm" or "long-lasting effects." See In re N-M-A, 22 I & N Dec. at 326. Additionally, as discussed above, Chavez conceded that he did not know who was responsible for the beating that Chavez contended resulted in his father's death, and Chavez did not establish a connection to the persecution his father personally suffered. See Shehu v. Gonzalez, 443 F.3d 435, 440 (5th Cir. 2006) (persuasive authority discussing that the facts that (1) the petitioner's father was kidnapped and executed, and (2) her husband was wounded, beaten, and subjected to attempted murder did not apply because they were not related to persecution personally suffered by the petitioner). Thus, Chavez failed to show either extreme past persecution or compelling reasons why humanitarian asylum was warranted in his case. See 8 C.F.R. § 1208.13(a), (b)(1)(iii)(A), (B).

Accordingly, we conclude that we lack jurisdiction to review whether Chavez's due-process rights were violated, or substantial evidence supported the IJ's denial of withholding of removal under the INA or the CAT. Furthermore, we conclude that the IJ's denial of asylum relief was supported by substantial evidence. We, therefore, dismiss Chavez's petition to the extent we lack jurisdiction and deny it to the extent he is seeking review of the denial of asylum.

**AFFIRMED IN PART. DISMISSED IN PART.**

20